An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-973

NORTH CAROLINA COURT OF APPEALS

Filed: 6 May 2014

IN THE MATTER OF:                           New Hanover County
                                            Nos. 09 JT 226, 11 JT 81
J.W.A.M. & A.N.J.B.


Appeal by Respondent-mother from order entered 21 June 2013 by Judge Melinda H. Crouch in New Hanover County District Court. Heard in the Court of Appeals 27 March 2014.


> *Dean W. Hollandsworth for Petitioner New Hanover County Department of Social Services.*
>
> *Law Office of Anna S. Lucas, PLLC, by Anna S. Lucas, for Respondent-mother.*
>
> *Poyner Spruill LLP, by Danielle Barbour Wilson, for Guardian ad Litem.*


STEPHENS, Judge.


*Factual and Procedural Background*

Respondent-mother appeals from the district court's order terminating her parental rights to the juveniles J.W.A.M.

("James") and A.N.J.B. ("Allison").[1]  After careful review, we affirm.

On 24 March 2011, the New Hanover County Department of Social Services ("DSS") took James and Allison into nonsecure custody and, the following day, filed a petition alleging that they were neglected and dependent.[2]  The petition alleged that Respondent-mother had mental health issues, lacked stable housing, and engaged in domestic violence with the juveniles' father.  On 20 May 2011, DSS filed a second petition alleging that James and Allison were neglected, based on a new incident of domestic violence between Respondent-mother and the father. The children were placed with a foster parent.

On 18 April 2011, Respondent-mother entered into a Family Services Agreement with DSS.  In a report submitted to the trial court, DSS stated that Respondent-mother was compliant during all meetings, actively participated in her parenting classes, had secured stable housing, was attending therapy, and had joined a domestic violence therapy group.  Respondent-mother had attended all scheduled visits with the children and met their foster parent.

---

[1] Pseudonyms are used to protect the identity of the juveniles and for ease of reading.
[2] At the time they were taken into DSS custody, Allison was nineteen months old and James was three months old.

On 29 June 2011, Respondent-mother stipulated to the allegations of neglect and dependency contained in the original petition, and DSS voluntarily dismissed the second petition. In an order entered on 20 July 2011, the trial court adjudicated the juveniles neglected and dependent.

In June 2012, James and Allison were returned to Respondent-mother for a trial home placement, with DSS retaining custody of the juveniles. In September 2012, however, Respondent-mother did not pick up Allison from her bus stop. DSS then returned Allison to foster care because Respondent-mother was not reachable by telephone. After eventually contacting Respondent-mother, DSS learned that James was not staying with her, and Respondent-mother would not reveal his whereabouts. DSS eventually learned that James was staying with an aunt whose parental rights had previously been terminated. Based on these events, DSS ended the trial home placement and placed the juveniles in foster care. On 19 October 2012, the trial court entered an order ceasing reunification efforts with Respondent-mother.

On 28 November 2012, DSS filed a petition to terminate both parents' parental rights to the juveniles. As to Respondent-mother, DSS alleged the following grounds for termination:

neglect, failure to make reasonable progress, and dependency. *See* N.C. Gen. Stat § 7B-1111(a)(1), (2), (6) (2013). The trial court conducted a termination of parental rights hearing on 18 and 29 April 2013. In an order entered on 21 June 2013, the court determined the existence of all three grounds alleged against Respondent-mother. At disposition, the trial court concluded that it was in the juveniles' best interests to terminate the parental rights of Respondent-mother. Respondent-mother appeals.[3]

## *Discussion*

In her three arguments on appeal, Respondent-mother challenges the trial court's determination that each ground for termination of her parental rights existed. A trial court may terminate parental rights upon a finding of *one* of the grounds enumerated in the termination statute. N.C. Gen. Stat. § 7B-1111(a). Thus, if this Court determines that the findings of fact support the trial court's determination of *any one* ground for termination, we need not review the other challenged grounds. *In re Humphrey*, 156 N.C. App. 533, 540, 577 S.E.2d 421, 426 (2003). We review the trial court's termination order to determine "whether the trial court's findings of fact were

---

[3] The trial court also terminated the parental rights of the juveniles' father, but he does not appeal.

based on clear, cogent, and convincing evidence, and whether those findings of fact support a conclusion that parental termination should occur[.]" *In re Oghenekevebe*, 123 N.C. App. 434, 435-36, 473 S.E.2d 393, 395 (1996) (citation omitted).

Because we conclude that the trial court's findings of fact are sufficient to support dependency as a ground for termination, we do not consider the other grounds for termination found by the trial court. *See In re Humphrey*, 156 N.C. App. at 540, 577 S.E.2d at 426.

Our General Statutes define dependency as a ground for termination as follows:

> [T]he parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of [section] 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.

N.C. Gen. Stat. § 7B-1111(a)(6). In determining whether a juvenile is dependent, the trial court is required to "address both[:] (1) the parent's ability to provide care or

supervision, and (2) the availability to the parent of alternative child care arrangements." *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005).

The trial court's finding of fact 14 addresses dependency as a ground for termination:

> The parents are incapable of providing for the proper care and supervision of the children due to mental health conditions, and these children are dependent children within the meaning of N.C.G.S. § 7B-101, and there is a reasonable probability that such incapability will continue for the foreseeable future. . . . The mother submitted to a psychological evaluation dated November 28, 2012 performed by Dr. Len Lecci and to which he testified at the trial of this matter and was admitted into evidence. She was found to have a primary diagnosis of Personality Disorder, Not Otherwise Specified with antisocial and borderline features along with extremely low to borderline intellectual functioning with a full scale IQ of 72 which places her in the 3rd percentile, scoring below 97% of the general population. Her insight into any psychological issues that she is experiencing is poor and any progress that she may make would require years to accomplish, even with full cooperation on her part with medication compliance and consistent and meaningful therapeutic intervention. Her behavior throughout this case makes this an improbable outcome. Additionally, there were no viable alternative child care arrangements, as the mother's relatives were eliminated by a termination of parental rights and the father's relatives were ruled out early in the case and no other viable options for

> care were advanced prior to the filing of the termination of parental rights petition.

Respondent-mother has failed to specifically challenge this finding of fact as lacking in evidentiary support. Therefore, it is presumed to be supported by competent evidence and is binding on appeal. *See In re M.D.*, 200 N.C. App. 35, 43, 682 S.E.2d 780, 785 (2009).

Instead, Respondent-mother argues that the evidence was insufficient to establish dependency as a ground for termination. As to the first prong of this ground, she argues that Dr. Lecci's evaluation is insufficient because (1) it was conducted only after reunification efforts were ceased; and (2) Dr. Lecci did not state that Respondent-mother was "incapable" of parenting, but only that it would be a challenge for her. Respondent-mother also points to her trial placement as evidence that she had the ability to care for her children and had addressed her mental health issues.

We are not persuaded by Respondent-mother's arguments. While Dr. Lecci was not of the opinion that someone with Respondent-mother's cognitive functioning is categorically unable to parent, he explained the challenges such an individual would face with respect to parenting:

> She does not have extensive cognitive

abilities to rely on to come up with novel adaptive solutions, I think would be a fair way to say that. It does not mean that her score's so low that she can't parent, but it does mean that her cognitive abilities are not going to be really a resource for her to rely on. So if she's going to be effective, it's because she has learned and practiced parenting techniques very well and can implement it; in other words, rote learning. This is not someone who's going to be able to pull stuff off [on] the fly, that's going to be adaptive and effective, because she doesn't really have the decision-making abilities to do that.

When asked whether intensive in-home services might help someone with Respondent-mother's cognitive ability learn how to parent, Dr. Lecci answered in the affirmative, but gave the following qualification:

And I think over a long period of time, it could be. Again, the key when you have a little lower cognitive functioning individual is rote learning, so kind of seeing it and doing it over and over again. Now, that's just referring to the cognitive scores here. As I said, I think there may be some personality aspects that make — so a very cooperative, willing learner with this IQ, I think, could acquire those skills with repeated exposure.

Now, if you factor in that someone might not be cooperative, that makes it a little harder. . . . I'm not sure if she would have that ability to do that unless she was engaged.

Dr. Lecci further explained that Respondent-mother's personality hinders her ability to take advantage of such services:

> Really, the thing that [Respondent-mother] would benefit most from is enlisting resources, resources of the people around her, resources therapeutic just in general, and essentially getting help. And because of her personality style, which is really to come across as kind of abrasive and to kind of push people off, it limits her using those resources or getting those resources.
>
> So in a sense, she's kind of fighting against herself. I mean, that's what makes this a little more complicated, is rather than engaging in a style in which you maximize the resources and draw resources to you, she pushes them away, but she needs them, but she may not realize she needs them.

The trial court accepted Dr. Lecci's opinion, finding that Respondent-mother's ability to parent would "require years to accomplish, even with full cooperation on her part with medication compliance and consistent and meaningful therapeutic intervention. Her behavior throughout this case makes this an improbable outcome." Despite Respondent-mother's argument to the contrary, this finding of fact supports the conclusion that Respondent-mother is incapable of providing proper care and supervision for her children.

Respondent-mother's remaining arguments as to the first prong of dependency are equally unavailing. The timing of Dr.

Lecci's evaluation is of no consequence to the determination of whether termination of Respondent-mother's parental rights was justified based on dependency, and Respondent-mother cites no legal authority for her argument to the contrary. Nor does the trial home placement negate the trial court's finding as to dependency. Indeed, testimony about Respondent-mother's trial home placement lends credence to Dr. Lecci's observations. A counselor testified that, during the trial placement, Respondent-mother seemed "annoyed" by the presence of DSS personnel providing services. A DSS social worker testified that Respondent-mother allowed a woman to live in her home who had previously lost custody of her own children. Respondent-mother was defensive about DSS having any input about who might live in the family home with her children. On one occasion, DSS discovered an unidentified male in the mother's bed and, on another occasion, Respondent-mother failed to take the children to a doctor in a timely fashion. On 17 September 2012, Respondent-mother failed to meet her older child when the child was dropped off by the bus. The older child was returned to foster care. Contrary to Respondent-mother's contention that the trial placement was successful, this evidence supports the trial court's determination that Respondent-mother is incapable

of providing for the proper care and supervision of the children.

Respondent-mother also challenges the second prong of the dependency analysis. She argues that the conclusion she lacked an alternative child care arrangement is not supported by the evidence because Respondent-mother proposed her aunt as a placement. Again, we are not persuaded. Respondent-mother did not propose her aunt as a placement until the termination of parental rights proceeding. "Our courts have . . . consistently held that in order for a parent to have an appropriate alternative child care arrangement, the parent must have taken some action to identify viable alternatives." *In re L.H.*, 210 N.C. App. 355, 364, 708 S.E.2d 191, 197 (2011). Here, Respondent-mother did not make any effort to identify an alternative placement until her parental rights were in jeopardy. Such action is insufficient to constitute making an appropriate alternative child care arrangement. *See id.* at 364-66, 708 S.E.2d at 197-98; *In re D.J.D.*, 171 N.C. App. 230, 239, 615 S.E.2d 26, 32 (2005). Therefore, the court did not err in finding that Respondent-mother lacked an alternative child care arrangement.

In sum, we conclude that finding of fact 14 is sufficient to establish that Respondent-mother is currently incapable of providing for the proper care and supervision of Allison and James, there is a reasonable probability that such incapability will continue for the foreseeable future, and Respondent-mother lacks an appropriate alternative child care arrangement. Accordingly, the trial court was justified in terminating Respondent-mother's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(6). The termination order is

AFFIRMED.

Judges CALABRIA and ELMORE concur.

Report per Rule 30(e).